75 P.3d 1075

STATE of Arizona ex rel., Terry GODDARD, Attorney General, Plaintiff–Appellee,

v.

R.J. REYNOLDS TOBACCO COMPANY, a New Jersey corporation, Defendant–Appellant.

No. 1 CA–CV 02–0238.

Court of Appeals of Arizona, Division 1, Department D.

Sept. 9, 2003.

Terry Goddard, Attorney General, By Craig W. Soland, Chief Tobacco Counsel, Douglas E. Lau, Assistant Attorney General, Phoenix, Attorneys for Plaintiff–Appellee.

Shughart Thomson Kilroy Goodwin Raup, P.C., By Brian M. Goodwin, Lori V. Berke, Phoenix, and Howard, Rice, Nemerovski, Canady, Falk & Rabkin, By H. Joseph Escher III, Pamela K. Fulmer, Evan S. Nadel, San Franciso, CA, Attorneys for Defendant–Appellant.

Bill Lockyer, Attorney General of California, Richard M. Frank, Chief Assistant Attorney General, Dennis Eckhart, Senior Assistant Attorney General, Amy J. Hertz, Deputy Attorney General, Michelle Fogliani, Deputy Attorney General, San Diego, CA, Attorneys for Amici Curiae.

## OPINION

WEISBERG, Judge.

¶1 R.J. Reynolds Tobacco Co. ("Reynolds") appeals from the grant of summary judgment to the State of Arizona and the denial of its own motion for summary judgment. At issue is the interpretation of a provision in a Master Settlement Agreement entered into by the parties. We affirm.

## BACKGROUND

¶2 In 1998, the State of Arizona, along with forty-five states, the District of Columbia, and five territories, entered into a Master Settlement Agreement ("MSA") with Reynolds and four other tobacco companies. The MSA ended litigation brought by the various governments seeking to restrict advertising of tobacco products and to secure funding for various public health purposes.

¶3 For many years, Reynolds sponsored the NASCAR Winston Cup Series of stock car racing events and has continued to do so as its single permitted Brand Name Sponsorship under the MSA. The Winston Cup involves a number of races at twenty-three different sites across the country held between February and November during each calendar year. The races last up to several days at each site.

¶ 4 Based on the length of the racing season, and applying its own interpretation of a key provision in the MSA, Reynolds placed year-round advertising at Phoenix International Raceway ("PIR"), the site of a NASCAR Winston Cup race, and at Firebird International Raceway ("FIR"), the site of hot rod racing events also sponsored by Reynolds. Reynolds refused to remove the advertising signs at either site despite demands from the State to do so. The State thereupon filed a complaint asserting that Reynolds' permanent outdoor advertising violated the MSA.[1] After both sides filed cross-motions for summary judgment, the trial court granted the State's motion and denied Reynolds' motion. Reynolds timely appealed.

## DISCUSSION

### A. STANDARD OF REVIEW

¶ 5 The material facts here are undisputed. The only issue is the appropriate interpretation of the MSA. The latter is a question of law, which we independently decide. *See Horton v. Mitchell,* 200 Ariz. 523, 527, ¶ 14, 29 P.3d 870, 874 (App.2001). We turn first to a brief overview of the MSA.

### B. THE MSA

¶ 6 The recitals in the MSA reflect the parties' "commit[ment] to reducing underage tobacco use by discouraging such use and by preventing Youth access to Tobacco Products." The parties settled their original lawsuit on terms that would "achieve for the Settling States and their citizens significant funding for the advancement of public health, the implementation of important tobacco-related public health measures, including the enforcement of ... restrictions related to such measures, as well as funding for a na-

tional Foundation dedicated to significantly reducing the use of Tobacco Products by Youth."

¶ 7 To achieve these ends, the MSA permanently bans any settling manufacturer from directly or indirectly targeting youth "in the advertising, promotion or marketing of Tobacco Products" or from doing anything to "initiate, maintain or increase the incidence of Youth smoking." Part III(a). It completely prohibits "Tobacco Brand Name Sponsorships" of concerts or events at "which the intended audience is comprised of a significant percentage of Youth" and limits tobacco manufacturers to one "Brand Name Sponsorship ... in any twelve-month period." Part III(c)(1), (2).[2]

¶ 8 The MSA also forbids the advertising of tobacco products in conjunction with the advertising of manufacturer-sponsored events and bans all references to the sponsorships when advertising tobacco products. Part III(c)(3)(A),(B). It further requires manufacturers to "discontinue Outdoor Advertising and Transit Advertisements advertising Tobacco Products within the Settling States" and requires the removal of all billboards, signs, and placards advertising tobacco products "in arenas, stadiums, shopping malls, and Video Game Arcades." Part III(d). But, with respect to brand name sponsorships, the mandate to discontinue outdoor advertising does not *"apply to Outdoor Advertising advertising the Brand Name Sponsorship, to the extent that such Outdoor Advertising is placed at the site of a Brand Name Sponsorship no more than 90 days before the start of the initial sponsored event, is removed within 10 days after the end of the last sponsored event, and is not [otherwise] prohibited."* Part III(c)(3)(E)(ii) (emphasis added).[3]

---

1. Courts in California and New York have interpreted the same provision of the MSA at issue here and have reached differing conclusions. *See People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.,* 107 Cal.App.4th 516, 132 Cal.Rptr.2d 151 (2003); *State v. R.J. Reynolds Tobacco Co.,* No. 401561/01 (N.Y.Sup.Ct. Feb. 5, 2002).

2. "Brand Name Sponsorship" is defined as an event for which "payment is made ... for use of a Brand Name ... (1) as part of the name of the event or (2) to identify, advertise, or promote

such event." Further, "[s]ponsorship of a single national or multi-state series or tour (for example, NASCAR (including any number of NASCAR races)), or one or more events within a single national or multi-state series or tour ... constitutes one Brand Name Sponsorship." Part II(j).

3. The MSA does not define either "initial sponsored event" or "last sponsored event."

## C.  THE PARTIES' DISPUTE

■ ¶ 9 The parties dispute the meaning of the above emphasized language (the "disputed provision") as it applies to Reynolds' advertising at sites like PIR. The State brought this lawsuit to force Reynolds to remove the outdoor advertising that it claimed had exceeded the window permitted by the MSA. It asserted that the permitted advertising window is to be measured by the events held at *each* site.  It argued that Reynolds' interpretation of the disputed provision violated both the plain language and the stated intent of the MSA.

¶ 10 Reynolds responded that the disputed provision permits it to post signs at each and every Winston Cup site within 90 days before the "initial sponsored event" *of the season,* which usually occurs in February, regardless of the event's location.  It reasoned below, as it continues to do on appeal, that because the racing *season* lasts well into November, a new "90 days before" period begins for the next racing season before the completion of the present season, which makes the signs continuously permissible.  Consequently, according to Reynolds, the disputed provision allows its signs to be posted at PIR every day of every year that it sponsors the Winston Cup series.

¶ 11 The trial court agreed with the State. From the MSA's plain meaning and context, it concluded that

> NASCAR events take place for several days at *each* site.  The reference to the initial and last sponsored event refers to the events at each site.  Had the agreement been intended to allow [Reynolds] to advertise the Brand Name Sponsorship at all the sites throughout the race season, the term "sites" rather than site would have been used.  Finally, to conclude otherwise would strip the "90 days before and 10 days after" language of all meaning.

(Emphasis added.)   Accordingly, the court granted summary judgment to the State and ordered the removal of all outdoor advertising signs that exceeded the authorized event-related window at either PIR or FIR.

## D.  OUR INTERPRETATION

■ ¶ 12 A number of principles guide our interpretation of this contract.  Generally, we "attempt to enforce a contract according to the parties' intent."  *Taylor v. State Farm Mut. Auto. Ins. Co.,* 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993).  We also "apply a standard of reasonableness" to contract language.  *Chandler Med. Bldg. v. Chandler Dental Group,* 175 Ariz. 273, 277, 855 P.2d 787, 791 (App.1993).  We construe a contract "in its entirety and in such a way that every part is given effect."  *Cardon v. Cotton Lane Holdings, Inc.,* 173 Ariz. 203, 207, 841 P.2d 198, 202 (1992).  Words are "ambiguous only when [they] can reasonably be construed to have more than one meaning."  *Id.* A contract is not ambiguous if the parties' intent is clear from the contract's language and "in view of all the circumstances."  *Smith v. Melson,* 135 Ariz. 119, 121, 659 P.2d 1264, 1266 (1983).

■ ¶ 13 Additionally, we read words "in the context in which they are used, and [considering] the purposes sought . . . by the agreement."  *Employmt. Sec. Comm'n v. Amalg. Meat Cutters & Butcher Workmen of N. Am.,* 22 Ariz.App. 54, 58, 523 P.2d 105, 109 (1974); *see also United Cal. Bank v. Prudential Ins. Co.,* 140 Ariz. 238, 259, 681 P.2d 390, 411 (App.1983) (to ascertain intent, we look at words in the context of the entire contract).  Our courts further have recognized that if the preamble of an agreement "is an expression of the reasons for [the agreement]," it may be considered in determining the parties' intent.  *Maddux & Sons v. Trustees of Ariz. Laborers,* 125 Ariz. 475, 478, 610 P.2d 477, 480 (App.1980).

¶ 14 On appeal, the State asks us to uphold the trial court's construction because it is consistent with the MSA's plain language and the agreed-upon goals of improving public health and reducing the exposure of young people to tobacco products and tobacco advertising.  It argues that, if the MSA had intended to permit simultaneous tobacco brand name advertising at every NASCAR site, the disputed provision would have permitted such signs "at the *sites* of a Brand Name Sponsorship."  The State also asserts that the MSA's purposes will be furthered

only if the window for advertising signs is applied on a site-by-site basis. Thus, the exception to the total ban on outdoor advertising ought to be read as allowing the placement of signs at a site like PIR 90 days before a race *at that site* and requiring the removal of such signs within 10 days after the race or event *at that site* has ended.

¶ 15 The State points out that, if we were to accept Reynolds' unconstrained interpretation, thousands of young people who attend nonsponsored events at PIR, as well as millions of viewers who watch other televised events at NASCAR sites, would be exposed to Reynolds' advertising, frustrating a stated purpose of the MSA. To prevent such unwanted exposure, the State urges us to read the exception for outdoor advertising at sponsored events as banning Reynolds' simultaneous and permanent advertising at every site of a sponsored event.

██ ¶ 16 Reynolds first responds that if the drafters had intended the State's proposed interpretation, they would have expressed it more clearly. While such clarity might be desirable in hindsight, we note, as did the trial court, that if the drafters had intended Reynolds' proffered interpretation, they would have used the plural "sites" to indicate an intent to allow simultaneous and nationwide advertising at every NASCAR site from the date of the first sponsored event of the season. They did not. When the parties have not fully expressed their intention by the words chosen, and both sides have offered differing interpretations, this court must resolve the dispute and attempt to enforce the agreement as the parties intended at the time of drafting. *See Taylor*, 175 Ariz. at 153, 854 P.2d at 1139. In doing so, we conclude, as did the trial court, that the subject language as a matter of law refers to the events at *each* site, not to multiple sites.

██ ¶ 17 Reynolds also urges us not to accept the State's characterization of the MSA's purpose as a restraint on tobacco advertising and particularly in the exposure of minors to such advertising. It maintains instead that the MSA's purpose was simply to settle the underlying lawsuit and that the language reflects a negotiated compromise

among competing interests. But we cannot disregard the recitals calling for such a result, which were agreed upon by all the parties to the MSA. *See Maddux & Sons*, 125 Ariz. at 478, 610 P.2d at 480 (when preamble gives reasons for agreement, it may reveal parties' intent); *see infra* ¶ 6.

¶ 18 To avoid the seemingly clear meaning of "at the site," Reynolds next argues that "at the site" is made plural by the disputed provision's use of the phrase "initial sponsored event." Reynolds reasons that "initial sponsored event" is a distinctive phrase that can only refer to the first event of the season rather than the first event at a site, and thereby expands the advertising window to permit year-around advertising at all sites. We, however, disagree with this interpretation.

¶ 19 We first observe that "initial sponsored event" is not self-defining. Outside of its use in the MSA, a reader could not ascribe only a single meaning to it.

¶ 20 Next, we note that the drafters of the MSA knew how to create and define words and phrases that were to be given only a single meaning when used in the MSA. They did so by defining fifty-four such terms. Significantly, "initial sponsored event" is not among them. *See* Part II(a)—(bbb).

¶ 21 Reynolds, however, argues that in Part III(c)(2)(A), the phrase "initial sponsored event" refers to the starting date for the twelve-month sponsorship period and, therefore, insists that it must have the same meaning in the disputed provision. It supports its position in two ways. First, it asserts that the contexts of both references are identical because both "trigger a temporal restriction." Second, Reynolds relies upon the "same meaning rule" of construction referred to by *Miller Cattle Co. v. Mattice*, 38 Ariz. 180, 188, 298 P. 640, 643 (1931). We, however, reject both arguments.

¶ 22 As to the context argument, Reynolds overlooks that the context of the first temporal restriction is the number of sponsorships a manufacturer may undertake, while the context of the second temporal restriction is when and where a sponsor may display outdoor advertising. Thus, in its first appear-

ance in Part III(c)(2)(A), "initial sponsored event" is placed in a sentence devoted to setting a starting date for the twelve-month sponsorship period. In its second appearance in III(c)(3)(E), the sentence deals with the length of time advertising may be placed "at the site of a Brand Name Sponsorship." Clearly, the context of each reference is different.

¶ 23 As to its "same meaning rule" contention, Reynolds places too much weight upon the language of *Miller Cattle*. In *Miller Cattle*, the issue was whether a contract reference to "head of cattle" meant only adults or included calves. *Id.* at 187, 298 P. at 642. The court in *Miller Cattle* explained the same meaning rule as recognizing that a clause cannot be interpreted without reference to its use in the entire contract.[4] *Id.* at 188, 298 P. at 642–43. The court also stated that if words in one part have a plain and definite meaning but are undefined in another part of a contract, the court will give the words the same meaning in both places. *Id.* at 188, 298 P. at 643. Reynolds therefore posits that, as applied here, the rule requires that the phrase "initial sponsored event" must mean "the first event of a series or season" in its second appearance in the MSA because that is its meaning in its first appearance.

¶ 24 Although we agree with the *Miller Cattle* observation that words used several times in an agreement may be intended to have a consistent meaning, we do not agree that the same meaning rule necessarily overrides other well-established canons of interpretation when the context of the words at issue differs. Thus, giving words a reasonable interpretation in one context does not compel that identical meaning in another context. *See United Cal. Bank*, 140 Ariz. at 259, 681 P.2d at 411 (we examine words in the context of the entire contract); *Bekins*

Van Lines Co. v. Hartford Ins. Group, 27 Ariz.App. 655, 659, 557 P.2d 1087, 1091 (1976) (words must be read in context of the purposes sought by the agreement); *Employmt. Sec. Comm'n*, 22 Ariz.App. at 58, 523 P.2d at 109 (words are interpreted considering an agreement's purpose and the word's context). For all these reasons, we reject the compulsory application of the same meaning rule here.

■ ¶ 25 Finally, Reynolds argues that the State's interpretation of the MSA unduly restricts its federal and state constitutional right of free speech and that any waiver of its rights should be narrowly construed. The State responds, and Reynolds does not disagree, that this issue is raised for the first time on appeal. Accordingly, we decline to address an argument not presented to the trial court. *Paloma Inv. Ltd. P'ship v. Jenkins*, 194 Ariz. 133, 137, ¶ 17, 978 P.2d 110, 114 (App.1998).

### ATTORNEYS' FEES

■ ¶ 26 Both sides have requested an award of attorneys' fees incurred in this appeal. *See* Ariz.Rev.Stat. § 12–341.01(A) (2003). In light of the outcome, we grant the State's request conditioned on its compliance with Arizona Rule of Civil Appellate Procedure 21.

### CONCLUSION

¶ 27 For reasons stated above, we conclude that the MSA only permits the posting of outdoor advertising at the site of a brand name sponsored event 90 days before the initial sponsored event at that site and requires the removal of such advertising within 10 days after the last day of the sponsored event at that site. We, therefore, affirm the trial court's grant of summary judgment to the State and its denial of summary judgment to Reynolds.

---

4. *Miller Cattle*, however, is the only Arizona case to rely on the "same meaning rule," which the court gleaned from Texas and California cases, and *Miller Cattle* has been cited only once since 1931, by the Ninth Circuit Court of Appeals. *See*

CONCURRING: DANIEL A. BARKER, Judge and ROBERT M. BRUTINEL, Judge *Pro Tempore.**

*McLane & McLane v. Prudential Ins. Co. of Am.,* 735 F.2d 1194, 1195–96 (9th Cir.1984).

* NOTE: The Honorable ROBERT M. BRUTINEL, Judge *Pro Tempore,* was authorized by the Chief Justice of the Arizona Supreme Court to partici-pate in the disposition of this appeal pursuant to Ariz. Const. art. VI, § 3 and A.R.S. §§ 12–145 through 147.